UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

                        CR. NO.   22-cr-20404

                        HONORABLE GERSHWIN DRAIN
                        ***FILED UNDER SEAL***

GLENN MITCHELL DENNISON,

        Defendant.

_____/

## SENTENCING MEMORANDUM IN SUPPORT OF A DOWNWARD VARIANCE

    Glenn Mitchell Dennison, 32 years-old, pled guilty to three counts of sexual exploitation of a child (Counts 1, 2, 4) and one count of Commission of a Felony offense involving a minor while on the Registry.   The total guideline range is limited by statute to 60 years, with a mandatory aggregate minimum of 35 years. Counsel respectfully requests a sentence of 35 years, a term that is more than sufficient, and not greater than necessary.   As the PSR points out, the average sentence for an offender with the same criminal history, offense level, and charges is *33.5 years*. PSR, ¶127. Counsel respectfully requests a sentence of 35 years, which is more than enough to severely punish Dennison.

1

## §3553(a) Sentencing Factors

**A. History and Characteristics of Mr. Dennison; Nature of the Offense**

Mr. Dennison is truly repentant for his actions, particularly because he himself was sexually abused when he was just 5 years old.   He understands the lasting impact of sexual abuse.   He knows that he has altered the course of development for three children under 10 years of age.   He knows this is extremely serious conduct and he has taken full responsibility for his actions.

Dennison grew up in a disturbing and dysfunctional home. After being molested when he was just 5 years old, starting at age 12, he had to tip-toe around multiple physical abuse incidents – committed by his father against his mother. Both parents were often drunk and "partied" excessively right in front of him.   This experience "normalized" the extreme use of drugs and alcohol for Dennison.   He was struggling emotionally and unsure what to do.   But things turned even worse.

Eventually when Dennison was 14, his mother just up and moved to Texas without him. Dennison felt truly abandoned, and the lack of communication since then has seriously damaged his relationship with her. As a boy, Dennison's grandparents on his mother's side joined the notorious Children of God cult, which

encouraged sexual activities with young children.[1] His grandparents were simply inaccessible to him.

During this time, Dennison elevated his drug and alcohol usage to the point that he used those substances to get *very* high and *very* drunk, usually at the same time. Dennison was particularly upset about the fact that his mother "took" his brother with her to Texas. He felt unloved, but the fact that his mother left with his only brother felt to him as if his mother clearly loved his brother more than him. With the lack of communication after she left, Dennison was sure that his mom was simply abandoning him. With these complicated feelings came a huge upsurge of drug and alcohol use. For Dennison, these substances were an unhealthy coping mechanism for the severe divides within the family, but his behavior simply mirrored the normalized chaos within his family.

His relationship with his father is also problematic. Dennison's alcoholism is severe and has been since he was 14 years-old, just after his mother left the family. Once Dennison starts drinking, according to his father, he very quickly gets blacked out drunk and irrationally angry.    To his father, Dennison was a completely different person when he drank or used drugs.    Dennison also consumed more and more

---

[1] Children of God cult was "hell on earth," BBC.com.

3

pornography. Yet, while recognizing the severity of Dennison's emotional pain, alcoholism and drug use – which have been present for 18 years now – his father would *still* provide liquor and drugs for him, and then "party" with his son. To sum up, in his teen years Dennison was severely depressed, often extremely high and drunk, and making foolish decisions.

Even more disturbing is the fact that Dennison's father is now in a romantic, live-in relationship with Dennison's ex-wife Lillian Fultz, the mother of the victim children in this case. It is just another example of the dysfunction that Dennison has dealt with since he was old enough to have memories.

By the time he was 17 years old, he was convicted of his first crime, a sex offense; he was sentenced to one-year imprisonment. After the incident in that case and prior to being convicted, Dennison seemed to be turning his life around. He completed his GED, obtained a job, and enrolled in college. He was devastated when he was convicted in that case and couldn't go to college. He spent a year in jail and was released on probation. He was ashamed of himself and the fact that he was labeled as a sex offender. He had difficulty complying on probation because he was excessively drinking and using drugs, and because he was struggling regularly with *homelessness*. He was sent to prison for approximately four years after violating the terms of his probation.

While in prison, Dennison was repeatedly targeted and utterly abused by the adult inmates – both physically and sexually. Each day he feared he'd be raped, beaten, bullied or killed. This experience changed the course of his life for the worse in many ways.

Both counsel and defendant understand the burden on this court. But a 35-year sentence sends a very strong message regarding Dennison's culpability in this case. As a result, counsel is respectfully requesting a downward variance to the aggregate 35-year mandatory minimum.

### (1) Dennison's Mental Health and Addiction History

Mr. Dennison has struggled with mental health issues since he was a child. He had difficulty coping with his mother being gone and felt severely depressed growing up. He has regularly experienced suicidal thoughts throughout his life. When Mr. Dennison was released from prison, he felt completely hopeless. Not long after, he attempted to commit suicide on a bridge in Port Huron and was rescued by fishermen. He spent some time in the psych ward before being released. He did not participate in any outpatient treatment following that suicide attempt.

Mr. Dennison started relying on alcohol and drugs to numb himself at a young age and that really never stopped until he was arrested in this case. Dennison's use significantly impacted his judgment and likely had long term effects because he had

started using long before his brain had finished developing. Dennison's brutal years as a child, and young adult all occurred before he was 25 years-old, an age when the brain is not fully formed yet. This is because the brain's frontal lobe, especially the prefrontal cortex – the brain's rational, logical governor on impulsive behavior, isn't fully mature until age 25 or later. The full development of the pre-frontal cortex of the frontal lobe allows individuals to process the logistics and the pros and cons of a decision before it is made. "'It lets us to do things most animals cannot,' explains Dr. Stanislaus. 'Decision making, logical thinking, reasoning — all of those things happen because of the frontal lobe.'"  "When Does the Brain Reach Maturity? It's Later than You Think," Journey to College (2022).  Because Dennison has had to struggle with multiple addictions, trauma, sexual and physical abuse, and a dysfunctional home on top of the damage to the brain from all the drugs and alcohol, it appears his frontal lobe never fully developed.

He has been drinking heavily and using marijuana since his teenage years. Alcohol use as a teenager is linked to changes in brain development, specifically the frontal lobe, which can impair decision making ability.[2]  As a teenager, Mr. Dennison also used cocaine and regularly consumed cough syrup to get high on DXM. DXM

---

2 Alcohol and the Adolescent Brain | National Institute on Alcohol Abuse and Alcoholism (NIAAA) (nih.gov)

"can cause an individual to become seriously detached from reality, resulting in dangerous and violent self-harming behaviors to the harming of other people."[3] Long term use of DXM can also lead to memory loss, mood disorder, and delusions.[4]

After he got out of prison, Mr. Dennison started using harder drugs. He felt like he had nothing to live for. He started using heroin soon after his release. He had such little regard for his life that the people he was using with told him that they were infected with Hepatitis C and that he would contract it if he used their needles - and he did it anyway. As a result, he did in fact contract hepatitis C. He continued to use heroin, and then stopped to use a variety of other drugs – crack cocaine, acid, and mushrooms.

When he was arrested in this case, he was drinking heavily, addicted to methamphetamines, and taking Kratom.[5] Mr. Dennison has been told by family members that he is a completely different person when he is using. He admits that he

---

[3] DXM Trip: What is Robotripping and Other Dextromethorphan Side Effects - American Drug Rehabs

[4] DXM Trip: What is Robotripping and Other Dextromethorphan Side Effects - American Drug Rehabs

[5] Kratom is a drug derived from Evergreen trees that creates similar effects to opiates, but also creates excessive stimulation – much like methamphetamine.   And like those substances, it is highly addictive.   National Institute on Drug Abuse, https://nida.nih.gov/publications/research-reports/methamphetamine/what-methamphetamine

was too consumed by his addiction to care at the time, but he now acknowledges how his drug addiction impacted him and the people around him.

Mr. Dennison also admits to suffering from a porn addiction. He began looking at porn when he was a teenager and his porn use increased rapidly over time. Initially, he was only looking at adult porn, but that changed as he came across different types of porn, including child porn. He became obsessed with watching porn. Mr. Dennison wanted help, but the nature of his issues made it hard to get.   He recognizes that he has a serious problem. He is ashamed of his actions. He is motivated to get treatment and try to figure out how he got to this point and where to go from here.

### (2) Social History and Needed Medical and Mental Health Services

#### (a) The Impacts of Childhood Abuse

The reality of child maltreatment is that its long-term effects adversely impact biological and cognitive development, and on the development of self.[6]  Aside from the loss of trust, one of the most significant effects of psychological trauma is difficulty with regulating the intensity of feelings and impulses. Mothers or other caregivers play this critical role in helping children and young adolescents regulate

---

6 Van der Kolk, B.A., Fisler, R.E. *Childhood abuse and neglect and loss of self-regulation*, Bulletin of the Menninger Clinic; Spring 94, Vol. 58 Issue 2.

their emotions by providing a balance between the soothing and the stimulating.[7] When the mother is absent, as she was for Mr. Dennison, the brain can develop abnormally.

Additionally, children who are maltreated, like Mr. Dennison, physically suffer damage to their growing brains. This too has psychological implications, such as emotional, social or cognitive impairments, which often manifest later into high-risk behaviors. The type of maltreatment, the frequency and duration, the severity, and the relationship to the perpetrator all impact the long-term consequences of the abuse.[8]  In addition, a child's future resilience is connected to how the child's family and community help to build the child's self-esteem, individuality within a family, intelligence, emotional regulation, humor, and independence.[9]

Mr. Dennison was in severe emotional distress from a young age. His home was a hostile environment that allowed Dennison to be sexually abused at 5 years old.   His parents were drunk and violent in front of him repeatedly. His mother left the family when Dennison was 14 years old.   But from Dennison's perspective, his mother was simply abandoning him, and his self-esteem plummeted even more. To

---

[7] Id.
[8] Id.
[9] Id.

Dennison, his mother's abandonment made him feel tainted, and severely undercut his own assessment of his self-worth at a young age.   The family made no effort to protect Dennison from the abuse he suffered.   Mr. Dennison was also not able to build resilience around his abusive childhood because his primary sources of support – his mother and father – were simply not capable of boosting his self-esteem and providing the nurturing he needed to balance his emotional instability.   As an adult, Dennison was diagnosed as bi-polar by a medical doctor (regardless of Dennison's opinion as to whether the diagnosis was valid).   See PSR, ¶79. What is also clear is that diagnosis came shortly after Dennison tried to commit suicide when he was 20 years old. *Id*.   Dennison wants and needs help and counseling for his mental health issues while incarcerated. PSR, ¶80.

Dennison also has Hepatitis C, a disease he developed when, in the midst of extreme drug use, needle drug users warned him not to use their needles because they had Hepatitis C.   In his drug-warped state, he decided to use the poisonous needle despite the warnings. He then contracted Hepatitis C and has never received treatment.   PSR, ¶78.

It is well known that Hepatitis C shortens the length of life, particularly when those years are served in a prison and particularly for those who had the disease for

years without treatment. Both of these facts are present in this case. Statistics show that being in prison will slash the lifespan expectancy of an individual by two years for every one year served behind bars. Vera Institute, https://www.vera.org/news/health-care-behind-bars-missed-appointments-no-standards-and-high-costs.   Even with a 35-year sentence, Dennison's life expectancy will be substantially diminished.

Studies show that people with chronic hepatitis C often develop liver cirrhosis and hepatocellular carcinoma (liver cancer) within 20 years, both of which cause premature death. Medicine Net, https://www.medicinenet.com/how_long_can_live_after_diagnosed_with_hep_c/article.htm.   Hepatitis C can also cause other medical conditions, such as diabetes, glomerulonephritis, and non-Hodgkin's lymphoma. It also damages the immune system.   Essentially, the immune system mistakenly attacks the thyroid, creating significant vulnerability to illnesses across the spectrum.   Healthline, https://www.healthline.com/health/hepatitis-c/effects-on-the-body#brain-function.

Given all the circumstances of this case, a sentence of 35 years – the aggregate mandatory minimum – is quite clearly, at a minimum, sufficient and not greater than necessary, as well as more than enough to accomplish the goals of Section 3553(a).

(b) <u>Dennison's First Criminal Sexual Conduct Conviction</u>

We often dismiss the potential harmful impact of being labeled as a sex offender, but Mr. Dennison is all too familiar with the struggles that come along with it. The facts of Mr. Dennison's first criminal sexual conduct case are much different than the facts of this case. When Mr. Dennison was 17 years old, he received his first criminal sexual conduct conviction. He received a one-year sentence followed by probation. Unfortunately, he struggled to comply with the terms of his probation because he was drinking, using drugs, and often homeless. He was violated and sent to MDOC for *four years*. At the time, Mr. Dennison was very small physically and exceedingly vulnerable due to his emotional state. He was terrified, for good reason. He was raped, beaten and harassed repeatedly.

Mr. Dennison was a child at the time of his first offense and should have been treated as such. It has been recognized that sex offender treatment for juveniles should be different than that of adults, and that psychosocial needs are different for juvenile sexual offenders than adult sexual offenders. [10] There have been concerns that untested sex offender treatment programs that have been used for juveniles could cause harm. [11] In fact, the DOJ's Office of Juvenile Justice and Delinquency

---

10 [The Effective Treatment of Juveniles Who Sexually Offend - PMC (nih.gov)](#)
11 [The Effective Treatment of Juveniles Who Sexually Offend - PMC (nih.gov)](#)

12

Prevention has funded a program called Supporting Effective Interventions for Youth and Problematic or Illegal Sexual Behavior to bridge the gap in sex offender treatment for youth. The program helps communities develop a holistic approach with family and community-based interventions to treating the child, helping the victims, and supporting the families. At least one of the programs funded by this initiative treated youth up to the age of 18 because the treatment needs are much different for children in that age group.[12] Although Mr. Dennison was given a relatively short sentence initially, he could have greatly benefited from a sentence and programming that was designed for juvenile sex offenders.

While Mr. Dennison was in the MDOC, he was victimized and raped. He was mistreated on a daily basis. This is a common experience in prison for people who have been convicted of sex offenses, but the harm is often exacerbated when someone is young and vulnerable like Dennison. He explained that people who were in the MDOC for criminal sexual conduct cases were cornered, beat up, and sexually assaulted on a regular basis. The gangs were always threatening them. While in custody, Mr. Dennison was surrounded by people who committed a variety of sex crimes. They were the only people that would associate with him. During the years

---

12 [The Effective Treatment of Juveniles Who Sexually Offend - PMC (nih.gov)](https://nih.gov)

Mr. Dennison would have theoretically been exploring healthy sexual development with people of his own age, he was surrounded by a large group of men, many of them significantly older, talking about violent sexual assaults and the exploitation of young children. When he got out of prison, he was full of shame, angry, and more confused sexually than he had been before he went in.

The reintegration process is difficult for many people coming out of prison, but it is particularly difficult for sex offenders. Due to the nature of the crime and the registration requirements, people like Mr. Dennison often struggle with housing, employment, and social relationships after they are released from prison.[13] Because Mr. Dennison was barely an adult when he went in, he found it very difficult to figure out how to "run" his life. He had never experienced what it was like to live in society on his own as an adult. When Mr. Dennison was released, he was consumed by the shame that comes with being labeled as a sex offender. He was severely depressed and felt like there was no point in living. He fell into old patterns and turned to alcohol, drugs, and porn.

(c) <u>The Reality of Being a Sex Offender in the BOP</u>

Life in the BOP is difficult for everyone, but it is particularly difficult for

---

13 [SA317540.qxd (psu.edu)](SA317540.qxd (psu.edu))

people who have been convicted of sex offenses. Because of the mistreatment by other inmates and staff, they tend to have a much harder time than people in for other serious offenses, including murder. We consulted with a BOP expert, Jason Terris, to get information about security classifications and the unique struggles of people in the BOP who have been convicted of sex crimes. Mr. Terris has decades of experience working in the BOP, including working as the warden at Milan for almost seven years.[14] As you can see in Mr. Terris' declaration, people who commit sex crimes face many additional hardships in the BOP on a daily basis.[15] See ***Exhibit 1***, Terris Declaration.   When explaining how Mr. Dennison will be treated in the BOP, he stated "the inmate population will ostracize him at a minimum or victimize him at an extreme."[16]

The length of time that Mr. Dennison receives directly impacts his security classification and overall safety during his time in the BOP. As noted in the declaration, if Mr. Dennison receives less than thirty years, he will be placed in a medium security level facility. If he receives more than that, he will be placed in a high security facility.[17] As explained in the declaration, high security facilities are

---

14 Ex. A, Declaration of Jason Terris, p.2
15 Ex. A, Declaration of Jason Terris, p.4, par. 11-13
16 Ex. A, Declaration of Jason Terris, p.4, par. 12
17 Ex. A, Declaration of Jason Terris, p. 5, par. 15

often run by gangs who enforce specific social groups, including the isolation of sex offenders. The gangs have so much influence and authority that they effectively prevent sex offenders from being able to wait in line for their necessary things, such as food and medicine, and prevent them from being able to participate in recreational activities or to say anything to Prison staff.[18] People who are convicted of sex offenses essentially live in fear at all times because they know there are consequences for breaking these unwritten social rules. As noted in the declaration, in a penitentiary, these practices are not interrupted by staff because it allows the daily operations to continue without the need for additional staff involvement.[19]

Unfortunately, the staff have a limited ability to protect people who are being victimized in the BOP due to gangs, violence, and staffing issues. As explained in the declaration, when someone feels unsafe or gets assaulted like many sex offenders do, they are placed in the Special Housing Unit (SHU). This occurs at the detention center as well as all facilities of all security levels. As noted in the declaration, the SHU is typically used for discipline, but it also is the only place an inmate can seek protection if they have been assaulted, threatened, or feel unsafe.[20] When someone is placed in

---

18  Ex. A, Declaration of Jason Terris, p. 6, par. 18
19  Ex. A, Declaration of Jason Terris, p. 6-7, par. 18
20  Ex. A, Declaration of Jason Terris, p.7, par. 19; p.9, par. 24

the SHU for safety concerns, they are prohibited from participating in programming and restricted to a single or two person cell at all times except for five hours per week.[21] Even that limited amount of "out" time can be eliminated if there are staffing shortages or other concerns at the facility. People in the SHU are also essentially cut off from their social support because they are limited to one fifteen-minute phone call per month.[22] As noted in the declaration, these practices can cause significant mental health issues while in custody and make reintegration much more difficult.[23] Medical research shows that the denial of meaningful human contact often causes "isolation syndrome," the symptoms of which include anxiety, depression, anger, cognitive disturbances, perceptual distortion, paranoia, psychosis, self-harm, and suicide. Penal Reform International, https://www.penalreform.org/issues/prison-conditions/key-facts/solitary-confinement. It is simply unreasonable and damaging to subject *victims* to what amounts to severe punishment.   Yet, as the former Warden of Milan Correctional, Mr. Terris confirms that this will be yet another severe hardship of Dennison's time in the BOP as a sex offender.

---

21 Ex. A, Declaration of Jason Terris, p.7, par. 20-21
22 Ex. A, Declaration of Jason Terris, p.7, par. 21
23 Ex. A, Declaration of Jason Terris, p.8, par. 22

(d) <u>Thirty-Five Years is More Than Enough to Serve the Goals of Sentencing</u>

Mr. Dennison takes full responsibility for his actions and knows that he deserves a significant sentence. This Memorandum is in no way in effort to excuse his actions or garner sympathy for him. That being said, the impact of the length of his sentence on his security classification is one of his biggest concerns in determining a resolution to this case. If Mr. Dennison were to receive a 35-year sentence, with time served and good time, he would be very close to the 30-year threshold.   Even though it appears he will have to spend some time in a penitentiary, a 35-year sentence should get him into a medium security prison soon after his term begins. High security facilities are violent and dangerous for everyone, but particularly so for people convicted of sex offenses. Our primary goal is to ensure that Mr. Dennison will be as safe as possible in the BOP.

Mr. Dennison is currently 32 years old. He has never served more than four years in prison, so a thirty-five-year sentence is a about 9 times his prior custodial sentence.   If Mr. Dennison received a 35-year sentence, he would be over 60 years old at the time of his release. And then Dennison will be on rigorous supervised release for years.   By that point, he would have had the opportunity to participate in the sex offender treatment program. He would have reached an age where he would

be less likely to reoffend, as research suggests that risk of sexual recidivism decreases with age.[24]

Mr. Dennison will have limited access to treatment in the BOP. As noted in the declaration, he would have the opportunity to participate in a residential or non-residential sex offender treatment program.[25]  Based on our discussions with the BOP expert, there are no other sex offender treatments available so the total length of sex offender treatment that Mr. Dennison would receive in custody would not exceed eighteen months. Although there are various types of other programming in the BOP, Mr. Dennison may be excluded by other inmates because of his offense type. He would also have access to more comprehensive substance abuse, mental health, and sex offender treatment in the community upon release.

Mr. Dennison has also been diagnosed with Hepatitis C and therefore is likely to have a shortened life span and more likely to suffer serious medical conditions, such as cirrhosis, liver failure, and liver cancer later in life. If Mr. Dennison survives in prison until he is 60 or older, he is more likely to have significant medical conditions that limit his overall functioning and may even need to reside in a nursing

---

24 The Development of Sexual Aggression through the Life Span - BARBAREE - 2003 - Annals of the New York Academy of Sciences - Wiley Online Library
25  Ex. A, Declaration of Jason Terris, p.11, par. 29

home or assisted living facility upon release. A sentence of 35 years could significantly cut medical costs for the BOP while allowing Mr. Dennison to spend his final days in the community.

### B. **Punishment, Deterrence, and Protection of the Public**

Without a connection to community values, sentencing guidelines are unprincipled, and sentences themselves result in "public misunderstanding of the relative seriousness of criminal conduct, undermine the criminal law's moral standing, and diminish the criminal law's normative force." See, Paul H. Robinson et al., *The Disutility of Injustice* 60 (Univ. of Pa. Law Sch. Pub. Law Research Paper No. 09-24 2009), available at http://ssrn.com/abstract=1470905.

Federal District Court Judge James S. Gwin, in conjunction with other Federal Judges in Ohio, performed a study of the recommended sentences of Federal juries following conviction *after trial*, as a way of attempting to gauge the legitimacy of the Federal Sentencing Guidelines and their ability to generate a just sentence from the perspective of the community.   The study revealed that "the median Federal Sentencing Guidelines recommended sentence [in this case 60 years] is four and a half times the median juror-recommended sentence" - which in this case would be **35 years due to the mandatory minimum**."   See, Judge James S. Gwin, *Juror*

*Sentiment on Just Punishment: Do the Federal Sentencing Guidelines Reflect Community Values?* 4 (Harvard Law & Policy Review 2010), at 192.

But even more telling, as the PSR points out, the average sentence for an offender with the same criminal history, offense level, and charges as Mr. Dennison is *33.5 years*. PSR, ¶127. Counsel respectfully requests a sentence of 35 years, which is more than enough to severely punish Dennison.

In *United States v. Collins*, 828 F.3d 386 (6th Cir. 2016), the Sixth Circuit upheld a downward variance from a guideline range of 267-327 months to the five-year mandatory minimum in a serious CP case **after a jury trial**. *Collins, Id*. at 388. The district judge in *Collins* polled the jury as to what would be an appropriate sentence.   Every juror answered somewhere between probation and 60 months, with an average of 14.5 months and a median of 8 months. The judge then sentenced Collins to the mandatory minimum five-year term. *Id*.

In sum, counsel is advocating that based on all of the factors under Section 3553(a), an aggregate sentence of 35 years imprisonment – the statutory floor – is more than enough to satisfy the goals of punishment, deterrence and protection of the public pursuant to Section 3553(a)(2).

A sentence of 35 years will undoubtedly provide general and individual deterrence.   In addition to the weight of that sentence, Dennison has already suffered

private and public humiliation from this conviction; has been threatened in jail; will have to register as a sex offender; and must undergo strict community supervision with a variety of difficult conditions. In sum, a 35-year sentence provides an effective deterrent to any future criminal conduct by the defendant or any other individuals who would actually consider committing the instant offenses – at least to the extent possible. [26]

## C. Sentence Disparities

A sentence of 35-years imprisonment would not create any unwarranted sentencing disparities among defendants with similar records and similar conduct. As noted previously, the average Federal sentence for an offender with the same criminal history, offense level, and charges as Mr. Dennison is *33.5 years*. PSR, ¶127.

## CONCLUSION

Mr. Dennison is genuinely remorseful for the harm that he has caused to the minor victims, their families, and the overall community. He takes responsibility for

---

[26] "The social science literature suggests that potential offenders commonly do not know the law, do not perceive an expected cost for a violation that outweighs the expected gain, and do not make rational self-interest choices." Paul H. Robinson & John M. Darley, *The Role Deterrence in the Formulation of Criminal Law Rules:   At Its Worst When Doing Its Best*, 91 Geo. L.J. 949, 951 (2003); *in accord* Richard S. Frase, *Punishment Purposes*, 58 Stan. L. Rev. 67 (2005).

his actions and acknowledges that he deserves a significant custodial sentence. We request that you consider the information presented in this Sentencing Memorandum and the attached declaration in support of a downward variance. For all these reasons, Counsel respectfully requests a sentence to the mandatory aggregate minimum of 35 years.

Respectfully Submitted,

FEDERAL DEFENDER OFFICE

s/ Todd A. Shanker
Attorney for Glenn Mitchell Dennison
613 Abbott St., 5th Floor
Detroit, MI 48226
(313) 967-5879
Dated: September 16, 2024          Email: Todd_Shanker@fd.org

## CERTIFICATE OF SERVICE

On September 16, 2024, I filed the foregoing Memorandum with the Clerk of the Court. The parties will be served via email.

Diane Princ                    Reginald B. King
Assistant U.S. Attorney        US Probation Officer

/s Todd Shanker
Deputy Defender