UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN (DETROIT)

|  |  |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>Plaintiff )<br>)<br>)<br>v. )<br>)<br>GLEN MITCHELL DENNISON, )<br>)<br>)<br>Defendant. )<br>) | **Docket: 2:22-cr-20404-GAD-KGA-1**<br><br>**DECLARATION OF**<br>**JASON TERRIS** |

## BACKGROUND OF DECLARANT

### DECLARATION OF JASON A. TERRIS

I, Jason A. Terris, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

**BACKGROUND**

1. I am a Federal Bureau of Prisons ("BOP") consultant. As a former BOP Warden, former Associate Warden at a federal medical center, and having held various positions within the BOP's Health Services Administration, including Regional Health Services Administrator, I have specialized knowledge in matters concerning health policy, services, and administration within the BOP system.

2. I also provide consulting services on all aspects of the federal prison system for private attorneys, the Offices of the Federal Defender, individuals, and family members of those facing a possible federal prison sentence, or for those who have already been

sentenced or incarcerated.

3. I worked at the BOP for over 25 years in various capacities. My last position was the Warden at FCI Milan in Michigan. Just prior to that, I was an Associate Warden at FCC Coleman in Florida, which is the largest correctional complex in the BOP that at the time had a population of over 7,000 inmates, and before my stint at Coleman, I was an Associate Warden at the federal medical center ("FMC") named FMC Lexington in Kentucky.

4. Prior to my years as BOP Warden and Associate Warden at two different complexes, I held the position of Regional Health Services Administrator, where I was responsible for overseeing the health policy, services, and administration at 18 federal prisons in the North Central Region, including two FMCs: FMC Rochester in Minnesota and USMCFP Springfield in Missouri.

5. During my experience with the BOP, I held responsibilities involving management of sex offenders in general population and understand the unique issues they face during a term of incarceration. Specifically, as it relates to my experience, there were over 200 sex offenders at FCI Milan where I was warden and I understand the challenges of managing this population within the general population. Theses challenges include housing, integration into the general population, participation in programming, protective custody, and transfers.

6. I hold a Master's Degree in Health Services Administration from Central Michigan University and a Bachelor's Degree in Health Administration from Eastern Michigan University. A copy of my resume which includes my relevant work experience is attached as Exhibit A.

## SCOPE OF WORK

7. I was contacted by Todd Shanker, Esq., from the Office of the Federal Public Defender, Eastern District of Michigan. Mr. Shanker represents Defendant Glen Mitchell-Dennison ("Dennison") in this case. Mr. Shanker requested this document in support for Mr. Dennison's forthcoming sentencing hearing in the United States District Court, Eastern District of Michigan.

8. I was asked to provide an overview and offer my expert opinion about how a sentence imposed by this Court would be carried out by the BOP.

9. In preparing this document, I reviewed certain documents related to the offense and the plea. The documents I reviewed included:

    - Criminal Complaint filed July 21, 2022.
    - Criminal Indictment filed August 2, 2022.

10. I mostly relied on my experiences while working at the BOP and guidance from counsel on the following topics:

    - Information regarding security classification and the effects of sentence length on that classification.
    - Explain the difficulties of being in prison as a sex offender, both to explain what the next couple of decades (at least) of his future will be like and to contextualize what it was like for him the first time he was incarcerated.
    - Whether there are privileges that people with child pornography offenses are not able to access.
    - Life in high security prisons for sex offenders.
    - Explanation of what the BOP sex offender treatment program entails and when, during incarceration, an inmate may participate in such a program.

## SUMMARY OF FINDINGS

11. The mission of the BOP is to protect society by confining offenders in the controlled environments of prisons and community-based facilities that are safe, humane, cost-efficient, and appropriately secure, and that provide work and other self-improvement opportunities to assist offenders in becoming law-abiding citizens. It is not meant to further punish an individual beyond the taking away of their freedom and strict adherence to the rules of the institution. However, within the prison environment there are situations where additional punishments are placed on individuals simply because of the nature of their crime. These punishments, or lack of rights, are typically enforced by the other general population of inmates or are perceived punishments, particularly placement of sex offenders in isolation, that are done for the protection of both inmates and staff. These situations are quite common as it relates to sex offenders housed throughout the BOP.

12. Dennison's sex offense will make his time in prison more difficult as many in the inmate population will ostracize him at a minimum or victimize him at an extreme. Sex offenders are particularly vulnerable to predators in prison.

13. Depending on where Dennison serves any sentence imposed, he may undergo undue stress and an unequal incarceration as compared to others who do not have a similar offense. This is particularly true as the security classification of the institution increases.

## BUREAU OF PRISONS CLASSIFICATION AND DESIGNATION

14. The BOP classifies facilities into four categories which are Minimum (Camp), Low

FCI, Medium FCI and High security (USP). Based on my analysis of Mr. Dennison's security classification, he will likely score as Low Security and will receive a Public Safety Factor Sex Offender making him ineligible to ever be placed at an institution lower than a Low. More information can be found in the BOP's policy.[1] The factors that drive his security classification are his age, his crime, criminal history, past violence, education level and substance abuse. Without a Presentence Report, it is difficult to more accurately assess Mr. Dennison's security score. I was able to use some known factors to calculate that he would score between 12 and 15 points, making him a Low security inmate.

15. One other factor used to determine security classification is the length of sentence imposed by the Court. The BOP Program Statement considers the length of time remaining in the sentence as factor in determining security classification. If Mr. Dennison receives a sentence below 20 years remaining (net of jail credit served and Good Conduct Time of 54 days of each year of the imposed sentence), then he would remain at a Low security. However, if he has more than 20 years remaining in his sentence but less than 30 years remaining, he would receive an additional Public Safety Factor for length of sentence and would be housed initially at a Medium Security facility. If a sentence is imposed that yields a sentence of 30 years or more remaining, Mr. Dennison would be determined to be a High security inmate and will be placed at a US Penitentiary.

16. For most able-bodied inmates, the BOP attempts to designate offenders to a facility

---

[1] Department of Justice, Federal Bureau of Prisons, CPD/CPB, Number P5100.08. *Inmate Security Designation and Custody Classification)"* September 12, 2006.

within 500 miles of the legal residence. Mr. Dennison currently resides near Detroit, MI, where low security prisons are available. However, if he gets a longer sentence, more than 20 years remaining, then he would be housed at a Medium security prison, and more than 30 years remaining would place him at a High security prison. He is currently being held at Sanilac County Jail.

## TREATMENT OF SEX OFFENDERS

17. The BOP recognizes sex offenders as a vulnerable population within its institutions. Institutional assignment, unit management, Psychology Treatment Programs, and re-entry planning are in place to assist sex offenders while incarcerated and help both the offenders and society by reducing the chances of another offense after release from prison. Specific program treatments are available for sex offenders but many sex offenders who do not participate in programming do try to go to facilities where there are like-offenders to avoid confrontation with other inmates.

18. Because inmates who commence their prison sentences at higher security level prisons become eligible for transfers to lesser secure facilities, the prison population at Lows can be comprised of aggressive and predatory inmates who prey on those who are most vulnerable or who are considered weak. At High security institutions, many of which are organized socially by gangs or "cars," a social group usually based on race, geographic history, religion, or social beliefs, strictly enforce the social aspects of prison. Sex offenders are not only excluded from most social groups, but they are also isolated as a group or made to be isolated as an individual from the general population. Their ability to wait in line for medication, food or to ask questions of staff, are all influenced by the offense they committed. Their ability to participate in recreational

activities is limited by their ability to interact with other members of the inmate population. This segregation, however cruel, allows the greater population of inmates to function with limited staff intervention.

19. When a sex offender violates these unwritten rules or is singled out by a group in the prison, they may feel threatened for their safety. As such, their only recourse is to seek protective custody in Special Housing Unit (SHU), a process known as Protective Custody. SHU is typically a place where inmates are placed in isolation as a sanction for disciplinary reasons or, as it was during the COVID-19 pandemic, to isolate from other inmates to prevent contagion. No matter the reason, SHU placement is indeed a punishment for the individual even if their placement there has nothing to do with them violating a prison rule.

20. The reason SHUs are sometimes referred to as isolation or solitary confinement is because of the times when inmates are housed alone in a cell within these housing units. The SHU units are comprised of two person cells, although there are times when inmates are housed alone in the cell. While in SHU, inmates are restricted to the cell for 23-24 hours each day. Inmates are provided one hour of recreation a day, five days per week. Unfortunately, the provision for recreation may be set aside because of staff shortages, emergency situations at the institution, and other extenuating circumstances. There is virtually no programming or interaction with anyone other than a passing staff member or a cellmate.

21. While assigned to the SHU, inmates receive one telephone call per month, ordinarily to a family member. Social visiting for inmates in SHU is also more restrictive than for those in general population. In addition, there are a limited and restricted number of

commissary items available for purchase by the inmate population residing in SHU. These items are limited for safety and security reasons.

22. There have been many studies, including one by the Department of Justice in 2016, on the physical and mental effects of long-term isolation of inmates. [2] The issue has also been a part of legislative action to try to curb the use of the practice. Senator Dick Durbin introduced the *Solitary Confinement Reform Act in 2019*, to reduce the use of solitary confinement in prison. As recent as April 2021, Senator Durbin questioned the use of solitary confinement by the BOP during testimony of BOP Director Michael Carvajal, *"Even short periods in solitary confinement can cause inmates to suffer depression, lack of sleep, anger, and suicidal ideations – and to lose access to productive programming. As a result, the negative effects of solitary confinement can extend well beyond incarceration, making it more difficult for inmates to reintegrate into the general population and reenter society once their sentence has been served."*

23. If the inmate in Protective Custody still does not feel safe after a certain period has passed while in SHU, they can refuse to come out into general population, which results in a disciplinary infraction on their record. After a period, the institution will be compelled to transfer the inmate to another institution to attempt to see if a more acceptable integration can take place. What I have seen is that this pattern of being placed in general population, Protective Custody, extended stay in SHU and eventual transfer to another institution is a pattern that repeats itself over a sex offender's period of incarceration. In many cases, there are also experiences of physical and mental abuse throughout the prison term.

---

[2] U.S. Department of Justice, "*Report and Recommendations Concerning the Use of Restrictive Housing*," January 2016.

24. When someone who has a sex offense is threatened in prison, their only recourse is to ask to be placed into protective custody. The result can be an extended placement in solitary confinement and ongoing fear of reentering general population. When in protective custody, inmates miss out on continuity of connecting with family, inability to participate in meaningful programming, and encounter the obvious stress of isolation.

### PRIVILEGES SEX OFFENDERS ARE NOT ABLE TO ACCESS

25. In some cases, the BOP determines that access to email is not available for some sex offenses, particularly those which involved solicitation via the Internet.

26. Inmate cafeterias are open to all inmates. However, seating in these areas is segregated by race, gang affiliation, cars or, in the case of sex offenders, by the crime committed. Sex offenders are often seated in areas where they are isolated, but also where there is significant separation from the population of inmates currently in the cafeteria.

### LIFE IN HIGH SECURITY PRISONS FOR SEX OFFENDERS

27. In general, higher security facilities have a more predatory environment than that of the Minimum-Security level facilities. Newly arriving inmates are often vetted by other inmates within the general population who are attempting to determine if a person is a cooperator or was involved in a sex offense involving minor children. This vetting process can be intimidating and has been problematic for the BOP to the extent that the BOP recently added a high severity prohibited act code to Program Statement 5270.09, Inmate Discipline Program (Change Notice dated November 18, 2020), Code 231-

"*Requesting, demanding, pressuring, or otherwise intentionally creating a situation which causes an inmate to produce or display his own court documents for any unauthorized purpose to another inmate.*" In my professional opinion, while this new infraction recognizes the problem, it has done little to minimize or discourage inmates, especially within the higher security level institutions, from demanding court transcripts or the court dockets citing the criminal charges. Inmates continue to confront other inmates when staff are not present, and it is unlikely other inmates would report such behavior for fear of being labelled a "rat." When inmates fail to produce these court records, they are at risk of being assaulted or require placement in protective custody. It is difficult to know how Mr. Dennison, who has been incarcerated, will react when confronted by this situation.

28. The BOP does not segregate inmates within a compound based on their instant offense. While co-conspirators or certain gang members may be separated between prisons or within a prison, there is no formal segregation by offense. However, within the social structure of inmates, sex offenders are often ostracized, eat alone or with others who have similar crimes and are usually not welcome to enter television rooms. They are also often excluded from certain recreational activities and, in extreme cases, assaulted and bullied. Having been assigned at various prisons of all security levels during my career with the BOP, I witnessed this treatment firsthand. No matter my best efforts to limit concerns related to this population, it was always difficult and concerning to successfully integrate sex offenders into general population in facilities where many sex offenders did not comprise the overall population or where a sex offender treatment program was not offered.

## BOP SEX OFFENDER TREATMENT PROGRAMS

29. The BOP offers sex offender treatment to offenders with a history of sexual offending and who volunteer for treatment. The program is defined in a specific Program Statement. [3] The Bureau provides two levels of treatment intensity: residential and non-residential. Eligibility for participation in a treatment program depends on an offender's evaluated risk of future sexual offending. Institutions offering this treatment often have a higher proportion of sex offenders in their offender population. This higher concentration of sex offenders within an institution helps offenders feel more comfortable acknowledging their concerns and seeking treatment.

   *Residential Sex Offender Treatment Program*
   Residential treatment involves high intensity programming for a period of 12 to 18 months. The Bureau provides this program at USP Marion in Illinois and at FMC Devens in Massachusetts. Participants benefit from a therapeutic community on a residential housing unit where they work to reduce their risk of future offending. Offenders receive treatment five days per week. This treatment targets offenders with an elevated risk of reoffending.

   *Non-residential Sex Offender Treatment Program*
   Non-Residential treatment consists of outpatient groups meeting 2-3 times per week for several hours. Program completion takes 9-12 months. The Bureau offers this moderate intensity program at several institutions, listed below. Participants learn basic skills and concepts to help them understand their past offenses and to reduce risk of future offending. This treatment is offered to offenders evaluated to have low to moderate risk of reoffending.

30. While the BOP tries to locate inmates within 500 miles of their address, that cannot always be accommodated. First, not every federal prison has the programs, such as sex offender treatment, needed for inmates. In addition, the transition into prison for sex offenders is often difficult as they learn to navigate the prison culture. In my experience, it is not uncommon for inmates with sex offenses to be transferred after incidents or attacks by other inmates. As such, it is difficult for the BOP to assure that

---

[3] U.S. Department of Justice Federal Bureau of Prisons. *"Sex Offender Programs,"* Program Statement OPE: CPD/PSB, Number 5324.10, February 15, 2013.

person is within 500 miles of their home location. However, the following is a list of facilities which do have a Sex Offender Treatment across the country:

**Low Security (10-20 years remaining in sentence)**
FCI Elkton (Low Security - Ohio)
FCI Milan (Low Security – Michigan)
FCI Englewood (Low Security - Colorado)
FCI Seagoville (Low Security – Texas)

**Medium Security (20-30 years remaining in sentence)**
FCI Marianna (Medium Security – Florida)
USP Marion (Medium Security – Illinois)
FCI Petersburg (Medium Security – Virginia)

**High Security (more than 30 years remaining is sentence)**
USP Tucson (High Security - Arizona)
USP Coleman II (High Security – Florida)

## CONCLUSION

31. Sex offenders are treated differently from other inmates in the general population of federal prisons. This is particularly true at the highest security level prisons.

32. If a sentence which yields a sentence of greater than 30 years remaining, Mr. Dennison will receive a Public Safety Factor related to Sentence Length. If, at the time his sentence is computed, Mr. Dennison has more than 30 years until his release he will be placed in a US Penitentiary. the highest-level prison in the BOP. There he will be ostracized. at a minimum, and [likely] assaulted. Sex offenders are often subject to abuse from inmates and sex offenders typically stay together as a group for protection. A sentence of

33. The BOP tracks judicial recommendations and have published reports that it complies with nearly 75% of those requests. In the case of Mr. Dennison. I believe if the Court

recommends a viable option that will allow successful programming during a term of incarceration this may be beneficial to all concerned. A judicial recommendation to the BOP that Mr. Dennison be committed to a facility with a commensurate security facility that has a residential Sex Offender Management Program (SOMP) so that he can avail himself of rehabilitative programs, specifically, the Sex Offender Treatment Program,

Signed on this 5th day of December 2023 by:

_____
Jason Terris (Dec 5, 2023 15:49 CST)

Jason Terris

# EXHIBIT A

# Jason A. Terris - Prisonology

Adaptable and strategic leader with 28+ years correctional experience and 16+ years hands-on approach driving solutions to complex business, technical, and financial problems. Experience leading $540 Million dollar initiatives partnering with Operations, Human Resources, Finance, IT, and other cross-functional teams. Skilled at business development including development of rebids and new bids for state contracts.

## SKILLS AND EXPERTISE

Strategic Planning  -  Issue Resolution  -  P&L Management - Business Development
Resource Management  -  Client/Partner Relationships  -  Problem Solver
Process Improvement - Recruitment and Retention - Operational Accountability - Minimum to High Security Facility Management

## ACCOMPLISHMENTS

Managed Budgets up to $540 Million Annual Budget, Managed Contracts in up to 6 States simultaneously, Leadership Development, Recruitment and Retention, Achieved 100% of mandatory standards for the American Correctional Association (ACA), The Joint Commission (JC), Prison Rape Elimination Act (PREA), and from the Accreditation Association for Ambulatory Health Care (AAAHC), National Commission on Correctional Healthcare (NCCHC)

## PROFESSIONAL EXPERIENCE

Prisonology, LLC – Expert                                                                                           Present

Corporate Vice President, State Operations, Corizon Health                       9/2019 – 12/2021

- Oversee an annual budget of $540 million
- Manage statewide Department of Corrections contracts in Michigan, Maryland, Kansas, Idaho, Missouri and Wyoming
- Coordinate and oversee various approaches to managing the COVID-19 epidemic within state prisons around the country including significant contract modifications, substantial augmentation of staffing, intensive testing requirements and more

Warden Federal Correctional and Detention Institutions, Milan, MI            11/2012 – 9/2019

- Maintained custody and control of more than 1300 federal inmates at the Detention Center and Low security correctional institution
- Managed $42-million-dollar budget and 300 staff (medical and correctional personnel)

- Achieved 100% of mandatory standards for the American Correctional Association (ACA), The Joint Commission (JC), Prison Rape Elimination Act (PREA), and from the Accreditation Association for Ambulatory Health Care (AAAHC)
- Developed a 12-month Leadership Program to prepare staff to be supervisors in the agency

Associate Warden, Federal correctional Complex, Coleman, FL                5/2010 – 11/2012

- Responsible for multiple departments including health services across five institutions with 7,600 inmates and 1500 staff.
- Conducted program evaluations and adopted changes to institution operations
- Implemented myriad policies and programs to improve complex operations

Associate Warden, Federal Medical Center, Lexington, KY                    9/2007 – 5/2010

- Responsible for Custody, Unit Management, Religious Services, Psychology, Inmate Systems Management, Medical, Clinical Programs, and Safety
- Achieved accreditation from the Joint Commission under Long Term Care and Ambulatory Care
- Received certification from the College of American Pathology
- Implemented and managed specialty areas Tele-medicine and the Bone Marrow Transplant operation

Regional Health Services Administrator, Regional Office, Kansas City, KS   4/2005 – 9/2007

- Responsible for 18 institutions including the supermax facility and two medical centers with an annual budget of $116 million dollars.
- Developed and initiated staff training throughout the region to enhance health care administration
- Worked to establish standards for medical care in the agency and to implement national health care initiatives at the local level
- Conducted numerous institution visits to enhance institution health care operations

| | |
|---|---|
| Health System Specialist, Health Services Division, Washington, D.C. | 12/2002 – 4/2005 |
| Health Services Administrator, Federal Detention Center, Houston, TX | 7/1999 – 12/2002 |
| Health System Specialist, Regional Office, Annapolis Junction, MD | 3/1997 – 7/1999 |
| Assistant Health Services Administrator, Federal Prison, Milan, MI | 1/1994 – 3/1997 |

## EDUCATION

Master's degree, Health Services Administration, Central Michigan University
Bachelor's degree, Health Administration, Eastern Michigan University

# Dennison Declaration Nov 27 2023 (1)

Final Audit Report 2023-12-05

| | |
|---|---|
| Created: | 2023-12-05 |
| By: | Donna Cormier (donna@prisonology.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA5tLrRjpdoM9CznO-n5p3BorUenZamT_j |

## "Dennison Declaration Nov 27 2023 (1)" History

- Document created by Donna Cormier (donna@prisonology.com)
  2023-12-05 - 5:57:23 PM GMT- IP address: 73.234.114.43

- Document emailed to jason@prisonology.com for signature
  2023-12-05 - 5:58:01 PM GMT

- Email viewed by jason@prisonology.com
  2023-12-05 - 9:44:55 PM GMT- IP address: 97.64.71.148

- Signer jason@prisonology.com entered name at signing as Jason Terris
  2023-12-05 - 9:49:14 PM GMT- IP address: 97.64.71.148

- Document e-signed by Jason Terris (jason@prisonology.com)
  Signature Date: 2023-12-05 - 9:49:16 PM GMT - Time Source: server- IP address: 97.64.71.148

- Agreement completed.
  2023-12-05 - 9:49:16 PM GMT

Adobe Acrobat Sign